SCHELDBERGER, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 13—March 10, 1931.*

For the plaintiff in error there was a brief by *Jonas Radcliffe* of Eagle River and *Edgar O. Eakin* of Chicago, Illinois, attorneys, and *W. J. Foulkes* of Oshkosh of counsel, and oral argument by *Mr. Foulkes.*

For the defendant in error there was a brief by *Earl L. Kennedy,* district attorney of Oneida county, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Kennedy* and *Mr. Messerschmidt.*

NELSON, J.  Before proceeding to discuss the various assignments of error it will be necessary briefly to review the facts in order that an intelligent understanding of the main events may be had.  Paul Brice, a resident of Chicago, had been going to Whispering Pines Resort in Oneida county for a number of years prior to 1929.  He was thor-

oughly familiar with the roads, the resorts, and the lakes in that locality. In 1929 the defendant and Brice came from Chicago to Oneida county, in the former's car, to spend their vacation. In the afternoon of August 7th they left the resort at which they had been spending their vacation intending to return to Chicago. They stopped at the Otter Rapids golf course and played golf. While playing there they overtook a party of girls, among whom were the complaining witness and Clara Syms. Brice and defendant engaged in conversation with the two girls and a "foursome" resulted. While playing around it was agreed that the four would attend a dance at the Jack O'Lantern Resort that evening. At about nine o'clock the defendant and Brice called for the two girls at the Syms cottage and started for the resort mentioned. On the way it was suggested by one of the men that the party go to Whispering Pines Resort where a dance was to be held, instead of to the Jack O'Lantern. Whispering Pines was the resort at which the defendant and Brice had spent their vacation and it was operated by Brice's brother. On the way a stop was made at Dead Horse Bend, where Brice procured a case of mixed pop and ginger ale and a gallon can containing alcohol. The party then proceeded to Whispering Pines Resort. Arriving there it was apparent that no dance was being held. Brice and defendant, however, routed out certain of the guests and visiting and dancing followed. Drinks were mixed and served. Each of the two girls, according to their testimony, drank only half a glass of the concoction. The boys, however, drank considerably more. During the evening Brice drank three "highballs," and just before the party broke up at about one o'clock drank eight additional drinks, one after the other. Nothing transpired during the evening which was particularly improper, barring the serving and drinking of the illicit liquor. Defendant and Brice apparently acted the part of gentlemen, although certain amatory

advances were made. About the time that the party ended it was suggested by some one that the girls stay all night, but this they refused to do and insisted that they be taken home. Thereupon they all got into the defendant's car—Clara in the front seat with the defendant, and the complaining witness, Terry, with Paul Brice in the back seat. Within a short distance from the resort the narrow road ran down a steep hill and on to a narrow bridge without rails, which crossed a running stream. In going over this bridge earlier in the evening the girls had noted its dangerous possibilities and, on approaching the bridge on the return trip, admonished the defendant not to drive too fast. The girls became somewhat excited. During the evening defendant and Clara had not gotten along very well and on one occasion Clara had slapped him when he tried to kiss her. Defendant apparently smarted somewhat under this punishment. When the car reached the bridge defendant stopped it on the bridge and said: "This girl (referring to Clara) has been too damn fresh to me this evening, I am going to throw her in the river." This was said in such a manner, accompanied by an attempt to grab Clara, as to frighten her. She immediately jumped out of the car, ran across the bridge and down the road. Terry also became frightened, jumped out of the car, and ran after Clara. Immediately thereafter Brice got out of the car and ran after Terry. Overtaking her, he grabbed hold of her, threw her to the ground and attempted to assault her, the details of which incident may well be omitted. Terry fought with Paul, screaming the while. Clara frantically beseeched the defendant to go to Terry's rescue, but he remained stolid, and remarked "Let Paul have his fun, let him have his good time." Thereupon Clara rushed over to where Paul and Terry were, seized hold of Paul's hair and pulled him off of Terry. Paul thereafter immediately attacked Clara, threw her to the ground and attempted to assault her. The de-

fendant came up to where Brice and Clara were, and Brice desisted in his attack on Clara. The defendant then said to Clara, "That is what you get for butting into other people's business; let Paul have a good time." Brice then again pursued Terry, overtook her further down the road, threw her down and, as testified to by Terry, committed rape upon her. In the meantime Clara went back towards the car and the defendant followed her. He went to the car, locked it and took the keys out. Clara begged him to take her home. After some time Terry and Paul returned to the car, Paul "dragging" or "pulling her along," as described by Clara. Terry's clothes were torn, her hair disheveled, and her appearance quite consistent with that of one whose person had been violated against her will. This is the incident upon which the first count of the information was based.

The girls then begged to be taken home. The car was started and proceeded a short distance down the road, when Brice told the defendant to stop the car. The defendant stopped the car and Brice again attacked Terry. There is testimony that the defendant at the request of Brice turned on the dome light of the car; that he refused to start the car when asked to do so by Clara; that he jokingly encouraged Paul during this attack; that Paul cursed and swore at Terry, and bumped her head against the back of the car; that Terry screamed and begged Brice to desist; that the defendant leaned over the back of the front seat and held Terry's legs and said to Brice "Now you got her." Clara continually begged the defendant to take them home. This is the incident upon which the second count in the information was based.

After a time the car was started once more on its way. After proceeding some distance, Brice again requested the defendant to stop the car, which request was promptly complied with, and another attack was made by Brice upon

Terry in all respects similar to the second attack hereinbefore described. This was the attack upon which the third count of the information was based. At the conclusion of this, the third attack, the car was started towards the Syms cottage. However, when the road was reached which turned into Sissons Resort (near which the Syms cottage was located), Clara observed the sign "Sissons Resort," and screamed, "Look out, you passed Sissons, and I want to get out;" to this the defendant responded by accelerating the speed of the car, and then remarking, "Damn you anyway; jump out now; go on, jump out now, and break your skull." After a little while the car was stopped and Clara jumped out of the car and ran back along the road towards Sissons. She was pursued by Brice, who caught up with her, grabbed her, threw her down into the ditch, tore her underwear off, and attempted to assault her. Clara kicked, scratched, and choked him. Brice choked her, but she finally succeeded in making Brice desist, and she got away. About this time another car came along, and Terry and Clara frantically signaled it to stop, but it only slowed down and then went on its way. The two girls then ran into the dark woods and attempted to hide. They became separated and lost to each other. Brice, however, followed Clara, found her in the woods and again attacked her. Clara fought and screamed and again her assailant desisted. After some time Terry was located and the girls brought back to the car. It was then beginning to get light and the girls were taken as far as Sissons Resort, where they were let out. Upon arriving at the Syms cottage Clara immediately fainted. Her clothes were dirty, her hair mussed, and her neck swollen. Terry said, referring to Clara, "I think she is all right, but they got me, they attacked me," and then she, too, fainted. Her dress was torn, her hair mussed, her stockings were hanging down, her shoes off, her face scratched. The two girls were put to bed, and later in the day were taken to a

doctor for examination. The testimony of the doctor revealed that both girls were virtuous prior to the attacks; that Terry had a temperature of 99.8; that her throat was rough and inflamed from crying and "hollering;" that her legs were scratched; that there were black and blue spots on her arms and wrists, and that her hymen had been recently ruptured; that Clara had a swelling over her right eye, a swollen upper lip, a scratch on her cheek, red spots or discolorations on her neck, a scratch on her back, a contused area on her thigh, but no injury to her private parts.

These are in brief the outstanding facts which were testified to upon the trial. A studied attempt has been made to eliminate from this opinion as many of the salacious details as possible, while preserving a fairly full and continuous recital of the revolting events of that night.

We may now proceed to discuss the several assignments of error. The defendant first contends that the court committed prejudicial error in making certain remarks in the presence of the jurors composing the panel, when the case was called for trial. While the remarks of the court are fully preserved in the record there is nothing to show that any of the jurymen were present within hearing distance. The remarks were made two days before the trial was begun and before the jury which tried the case was impaneled. The remarks complained of were made at a time when Mr. Smith, who had just been retained by Brice, was asking the court for additional time in which to prepare for trial. The court seemed somewhat incensed at a certain attorney who had apparently neglected to inform the court that he had withdrawn from the case. The remarks complained of were made in an extended colloquy which occurred between the court and the attorneys. The remarks complained of are as follows:

"The Court: Apparently the defendant Brice deemed it necessary for him to get a very high-priced counsel and

travel a long distance to get him. . . . He didn't need any high-priced counsel."

"The brother of the defendant . . . came to see me yesterday . . . after he had been traveling all over this Northern Wisconsin, pretty near. Why he came to me I don't understand. If he knew anything about matters he knew better than that. No use to see me. What he needed was a lawyer to try defendant's case. These cases are going to be tried in short order."

"The witnesses for the State have been here now for a week to ten days—detained here at the expense of the county. They came from Chicago. The longer they are detained the higher the expenses. If we are not able to go ahead with the case this afternoon it means that the county of Oneida will pay for a jury in attendance with no work done."

". . . I understand your position, Mr. Smith. You deserve the time. The defendant is deserving of nothing, so far as I can see."

"This dilly-dallying will not go on any longer."

While such remarks should not have been made when it was at all possible for members of the jury panel to overhear them, it does not appear that the remarks were so made. The record reveals that no objection to the remarks was made by counsel at the time. The record being silent as to the presence of members of the panel, we are inclined to believe that the able, fair, and experienced trial court would not be guilty of such impropriety in the presence of prospective jurors. In any event the remarks were not in any sense prejudicial to the defendant herein. They related to Brice.

The defendant next contended that certain remarks of the court, in ruling on evidence, were prejudicial to the defendant in that they manifested an unfair attitude of the court toward both defendants. The remarks complained of are the following:

"The Court: She has answered you." . . .

"The Court: She has so stated; that is unnecessary."

. . .

"The Court: No, it is proper to show the condition of these girls at the time. Go on." . . .

"The Court: She has answered you that she was never there and didn't know." . . .

"The Court: We have a lot of details here we don't want to waste time on." . . .

"Mr. Eakin: I don't know what seems to be the commotion out here, but I object to the laughing and comments back there in front of the jury.

"The Court: I didn't notice anything of the kind.

"Mr. Eakin: I strenuously object to it. Back here in this corner, every time I ask a question, there seems to be a delight in commenting on it—laughing and expressions of delight.

"The Court: I am not aware of anything of the kind. I have been looking out here, Mr. Eakin. I want the people to understand here there will be perfect order or we will remove you." . . .

"The Court: I don't think that is of any consequence. That hasn't anything to do with the issues in the case. I don't want to distract the jury's attention from what they are to decide." . . .

"The Court: . . . If the witness were to die here on the stand you would be denied that privilege." . . .

"The Court: If you have anything further to say, do so." . . .

"A. They didn't have enough on.

"The Court: Well, that might be the opinion of many of us or none of us. That don't help us a bit.

"The witness: They shouldn't go out in the wind without at least knickers or bloomers on." . . .

"The Court: I think we are really taking too much time in the identification of that car. I don't regard it as very material." . . .

We have carefully considered all of these remarks in connection with the questions and answers to which they relate, and we are unable to find therein anything of a prejudicial nature.

The next contention is that there is no evidence to support the verdict of the jury so far as the defendant is con-

cerned, because it was not proven that he knew of any unlawful design on the part of Brice to commit rape, because he did not himself have intercourse with the complaining witness, and because it was not proven that he aided, abetted, or assisted Brice in committing the offenses charged, either by taking part in, consenting to the criminal acts, or encouraging Brice to commit them. We are frank to say that if there had been no criminal assault other than the one on which the first count of the information was based, we would have some doubt as to the sufficiency of the evidence to support the verdict of guilty as to the defendant. However, the subsequent events in a clear sense relate back to the first offense and give color and meaning to what then happened. As to the events upon which the second and third counts were based, there can be no serious question as to the sufficiency of the evidence to support the conclusion that the defendant feloniously participated in them as an aider and abettor.

In *Vogel v. State,* 138 Wis. 315 (119 N. W. 190), it was held (p. 335) with reference to what a person must do in order to be guilty of the crime of rape as an aider and abettor, that the following instruction was proper in that case:

"In order to render himself so responsible, he must himself in some way aid or assist the other in overpowering the female or in effecting a particular act of intercourse under circumstances such as to make such act rape."

This instruction was claimed to be erroneous because the jury was not informed that the person aiding and abetting must be actively or constructively present at the commission of the offense, but this court held that the charge was neither misleading nor prejudicial.

In *State v. Brooks,* 138 Wis. 560, 120 N. W. 226, a question was reported to this court for answer. From the reported case it appears that two defendants were charged

with rape; that one Brooks had carnal knowledge of the body of the prosecutrix under circumstances having all the essentials of the crime charged; that one Burns was present and aided and abetted Brooks in the commission of the offense. Both were found guilty. The question reported was whether, under such charge and such proof, it was competent to convict Burns. The question was answered in the affirmative.

In *In re Carlson*, 176 Wis. 538 (186 N. W. 722), at p. 549 it was said:

"It is . . . well settled that one who is present aiding and abetting in the commission of a felony may be informed against as a principal and convicted as a principal, although he may have been guilty only of assisting in the commission of the offense."

*People v. Marx*, 291 Ill. 40, 125 N. E. 719, is a case in which the crime of rape was committed in an automobile and in which case the law as to aiders and abettors was discussed. It was there said (p. 48):

"It cannot be contended, of course, that mere presence at the commission of a criminal act renders a person liable as a participator therein. If he is only a spectator, innocent of any unlawful intent and does no act to countenance or approve the acts of those who are actors, he is not criminally responsible because he happens to be a looker-on and does not use active endeavors to prevent the commission of the unlawful acts. 'Notwithstanding these rules as to the non-liability of a passive spectator, it is certain that proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, lent to it his countenance and approval and was thereby aiding and abetting the same.' (1 Ruling Case Law, p. 141, and authorities there cited.) It is clear that the plaintiff in error, Alex Marx, who was driving the automobile, did not in any way

take part actively in the holding of the prosecutrix at the time when she charges the acts were being forcibly committed, but the evidence shows without contradiction, and he himself admits, that he drove the car several miles out of the way in Chicago while going from the cabaret to the hotel at Wabash avenue and Eighteenth street. His acts in this regard tend to show that he was actually encouraging and approving what was being done in the car."

We conclude that the record herein contains ample evidence to support the verdict of the jury and to sustain the conviction of the defendant as an aider and abettor.

The defendant contends that the court erred in charging the jury. We have carefully considered the whole charge and perceive no error or prejudicial instructions therein. The defendant particularly complains because the court in its instructions, after stating to the jury that the State claimed that Brice had committed the crimes of rape in Oneida county, and that the defendant was present and aided and abetted him in the commission thereof, stated: "It is not claimed that the defendant Scheldberger had sexual intercourse with Miss Formella in Oneida county."

There was no evidence offered even tending to prove that the defendant had any intercourse with Miss Formella. There was considerable testimony relating to the events which transpired in Vilas county, where the car made its final stop, when Clara was assaulted, and when the girls ran into the woods. The court no doubt intended by the instruction complained of to confine the jury's consideration strictly to the events which were claimed to have occurred in Oneida county. We perceive no error in this instruction.

It is further contended that the court erred in admitting in evidence three photographs taken of Terry's bare legs from her knees down, which photographs show scratches

and mosquito bites on her legs. We have examined the photographs and see nothing about them which would even tend to arouse the sympathies, prejudices, or passions of the jury. They added nothing to the testimony of the doctors which had already fully detailed the injuries sustained by Terry. Their introduction was harmless. *Campbell v. State*, 111 Wis. 152, 86 N. W. 555; *Krueger v. State,* 171 Wis. 566, 177 N. W. 917.

Defendant charges in his brief that the district attorney, in his closing argument to the jury, argued "that the defendant Scheldberger did not dare to take the stand in his own behalf," and further declared, "No wonder defendant Scheldberger did not care to testify; his clever, astute attorneys knew better than to put him on the stand." It is claimed in defendant's brief that the remarks were objected to and that the objection was sustained by the court. However, there is nothing in the record, which includes the affidavits presented on the motion for a new trial, to show that such remarks were ever made. The State in its brief denies that such statements were made, and the district attorney upon the oral argument vigorously denied ever making any such statements. We therefore do not feel called upon, in view of the state of the record, to pass upon this claim of error.

Defendant finally claims that since it appears from the cross-examinations of certain of the State's witnesses that Charles Center Case, a Chicago attorney, had investigated the case as a friend of Terry Formella and had taken statements from certain of the witnesses who had returned to Chicago, after leaving the Syms cottage in Northern Wisconsin, the defendant was prejudiced. *State v. Peterson,* 195 Wis. 351, 218 N. W. 367. There is nothing in the record from which it may be concluded that Mr. Case rendered any material aid to the district attorney in preparing

this case for trial or that he was guilty of any impropriety, or that he, by means of suggestions to the witnesses interviewed, introduced interpolations or additions to their testimony. He was not present at the trial. This court held in *State v. Peterson, supra,* that it is improper for a private attorney to render material aid to a district attorney in the preparation of a criminal case for trial. This court, however, said (p. 358) :

"This conclusion does not mean that a district attorney may not consult with parties interested in the prosecution of criminal cases, nor with attorneys who are under pay investigating the facts involved in the criminal prosecution. But it does mean that attorneys cannot be employed by private parties for the purpose of prosecuting criminal cases, whether the services are rendered in the court room, in the trial of the case, or in the office preparing the case for trial."

The affidavit of the district attorney, which was filed and used on the motion for a new trial, completely negatived the claim that Mr. Case assisted at all in the preparation of the case for trial.

Complaint is also made that George E. O'Connor, district attorney of Vilas county, assisted in the preparation of the case for trial. It appears that Mr. O'Connor, as district attorney of Vilas county, investigated the whole affair, particularly with a view to determine whether an offense had been committed within his county; that he conferred at different times with District Attorney Kennedy; and that he was present throughout the trial of this action but took no part therein other than to testify as a witness. The affidavit of the district attorney hereinbefore referred to denied that Mr. O'Connor had assisted him in preparing the case for trial. It is not perceived just why, in a case like this, involving criminal conduct starting in one county and continuing in another, it is improper for the district attorneys

of the two counties, both of whom are quasi-judicial officers, to confer and talk over the whole matter.

All other matters upon which error is claimed to be predicated have received our careful attention with the result that no prejudicial error has been found. The entire record has been carefully read and we cannot say that the verdict of the jury is not sustained by the evidence or that justice has not been done.

*By the Court.*—Judgment affirmed.